# UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**RAYMOND CHO-MIN LEE** and            Chapter 15
**PRISCILLA HWANG LEE,**                Case Nos. 09-21367-JNF and
    Debtors in Foreign Proceedings            09-21377-JNF (Jointly Administered)

~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the "Motion for an Order Pursuant to 11 U.S.C. §§ 1521(a)(5) and 1521(b) Directing the Turnover of All Assets of the Debtors Located in the United States to the Foreign Representatives" (the "Turnover Motion") filed by John Robert Lees ("Mr. Lees") and Mat Ng (collectively, the "Foreign Representatives").  Raymond Cho-Min Lee ("Raymond Lee") and Priscilla Hwang Lee ("Priscilla Lee") (jointly, the "Foreign Debtors") filed an Objection to the Turnover Motion.  Additionally, Oasis Development Enterprises, Inc. ("ODE") and East-West Enterprises Co., Ltd. ("EWE"), and their affiliates (collectively, the "US Companies") filed an Opposition to the Turnover Motion.  The Court conducted a trial with respect to the Turnover Motion on February 6, 2012.  Prior to the commencement of the trial, the parties narrowed the disputed issues

1

about the turnover of assets sought by the Foreign Representatives. The only remaining dispute among the parties concerns whether the Foreign Representatives are entitled to the turnover of the Foreign Debtors' equity interests in the US Companies.

At the trial, two witnesses, Mr. Lees and Jodie S. Garzon ("Ms. Garzon"), Senior Vice President of Finance and Controller of Oasis Consulting, Inc. ("OCI"), testified and 43 exhibits were admitted into evidence. At the conclusion of the trial, the Court directed the parties to file supplemental briefs.

The salient legal issues presented are 1) whether the Foreign Representatives are entitled to the turnover of the Foreign Debtors' equity interests in the US Companies; and 2) whether "the interests of the creditors and other interested entities, including the debtor," will be "sufficiently protected," if the Turnover Motion is granted and economic control of the Foreign Debtors' equity interests passes to the Foreign Representatives and, if not, whether the Turnover Motion should be denied. *See* 11 U.S.C. § 1522(a). Subsidiary issues, which are unresolved by existing case law, include who has, and what is, the burden of proof relative to whether the interests of the creditors and other interested entities, including the debtor, are sufficiently protected under applicable provisions of Chapter 15 of the Bankruptcy Code.

Most of the material facts necessary to decide the issues are not in contention. Rather, the ramifications of the "turnover" of the Foreign Debtors' equity interests to the Foreign Representatives are vigorously contested, although neither the Foreign Debtors nor the US Companies disagree that the Foreign Representatives have "stepped into the shoes"

of the Foreign Debtors with respect to their equity interests in the US Companies pursuant

to Hong Kong law.   In short, the Foreign Debtors and the US Companies maintain that

allowance of the Turnover Motion will trigger defaults under various mortgages

encumbering properties owned by entities in which the Foreign Debtors have direct or

indirect equity interests and expose Raymond Lee to huge potential liabilities with respect

to guaranties he executed in conjunction with financing of properties owned directly or

indirectly by ODE and EWE.  In addition, they maintain that rights of first refusal and other

transfer restrictions in the articles of organization or operating agreements of companies

in which the Foreign Debtors have equity interests will render "turnover" a problematic

and fruitless endeavor.

## II. FACTS

A. <u>The Turnover Motion</u>

Through their Turnover Motion, the Foreign Representatives seek an order pursuant

to 11 U.S.C. §§ 1521(a)(5) and 1521(b) directing the turnover of all assets of the Foreign

Debtors located in the United States.  As noted above, the parties resolved their disputes

as to the assets of the Foreign Debtors in the United States except for the equity interests

in the US Companies.  With respect to the equity interests, the Foreign Representatives

stated the following in their Turnover Motion:

> Given the current real estate market, it is likely that the Equity Interests have
> limited liquidation value at this time.  The Foreign Representatives intend to
> evaluate the Equity Interests to determine whether holding the Equity
> Interests in trust for the benefit of creditors (in the hope that the market will
> rebound) or conducting a public sale pursuant to section 363 of the

Bankruptcy Code, would maximize value to the Foreign Debtors' estates. Akin to a Chapter 7 Trustee, the Foreign Debtors [sic] can "step into the shoes" of the Debtors with respect to the ownership of the Equity Interests. . . .The Foreign Debtors [sic] acknowledge that any action they take with respect to the sale or liquidation of the Equity Interests must comply with the applicable provisions of any stockholder agreement governing the Equity Interests and US law.

B. <u>Background</u>

On November 24, 2009, the Foreign Representatives filed a "Verified Petition Seeking Entry of Order Recognizing Foreign Main Proceeding Pursuant to 11 U.S.C. §§ 1515 and 1517 and Relief Pursuant to 11 U.S.C. §§ 1520 and 1521" of the Bankruptcy Code against the Foreign Debtors.  At the time the Foreign Representatives filed their petitions, the Foreign Debtors had been adjudged bankrupts on August 31, 2009 following the filing of petitions in the High Court of the Hong  Kong Special Administrative Region Court of First Instance on April 28, 2009 and May 27, 2009.  The Hong Kong petitions were filed by Value Partners Strategic Equity Fund ("Value Partners") and Winchesto Finance Company Limited ("Winchesto"), entities to whom the Foreign Debtors owed substantial sums relating to the failure of Oasis Hong Kong Airlines Limited, a low-cost, long-haul airline founded by the Foreign Debtors in 2005.  The liquidated debt of the Foreign Debtors in the Hong Kong  proceedings is approximately $33 million, excluding  significant contingent debt owed to the Bank of China.

At the time they were adjudged bankrupts in Hong Kong, the Foreign Debtors held significant property interests in the United States.  For purposes of the present dispute, the Debtors have direct and indirect ownership interests in over 20 properties through their

ownership interests in tiers of corporations, limited liability companies, and single-asset, special purpose entities. The Debtors' ownership interests are undisputed.[1]

The top tier entities in which the Foreign Debtors have interests are OCI, ODE and EWE. In summary,[2] ODE is a Massachusetts real estate investment and management corporation, headquartered in Lynn, Massachusetts. It is the controlling entity of a group of real estate investment companies known as the Oasis Group, comprised of 16 properties. Raymond Lee is its Chairman, President, and Chief Executive Officer. Priscilla Lee is its Co-President and co-Chief Executive Officer.

OCI also is a Massachusetts corporation. It provides employees and human resources, accounting, and other services to ODE, which has no employees of its own. OCI employs 10 people, most of whom work in its offices in Lynn, Massachusetts. Raymond Lee is OCI's President, and both Foreign Debtors serve as directors.

The Foreign Debtors collectively own 71.4% of the shares of ODE, as well as 71.4% of the shares of OCI. Raymond Lee owns 38.1% of each company; Priscilla Lee owns 33.3%.

---

[1] Exhibits 36, 37 and 38 submitted by the Foreign Representatives are identical to exhibits attached to the Affidavit of Ivan S. Chow, the Managing Director of OCI and ODE. They graphically illustrate the organization of the US Companies and the Foreign Debtors' equity ownership interests in the US Companies. Mr. Chow's exhibits were produced in conjunction with the Foreign Debtors' Motion for Summary Judgment through which they sought denial of recognition of the Hong Kong proceedings as foreign main proceedings.

[2] The parties filed "Stipulated Facts" in conjunction with the Foreign Debtors' Motion of Summary Judgment. The Court has paraphrased information from those stipulated facts for purposes of elucidating information in the trial exhibits. There is no dispute as to those facts.

As noted above, the Oasis Group's portfolio currently is comprised of 16 commercial properties with more than 1,475,000 square feet of space leased to over 80 tenants.  All of the properties except one are located in Massachusetts. The non-Massachusetts property is located in Las Vegas, Nevada.  Specifically, Oasis Ten Milk Street Associates, Inc. owns Oasis Ten Milk Street LLC, which, in turn, owns a Class B office building located at 10 Milk Street, Boston, Massachusetts.  The Foreign Debtors own 40.48% of Oasis Ten Milk Street LLC and EWE owns 27.932%.  Raymond Lee is President of both Oasis Ten Milk Street Associates, Inc. and Oasis Ten Milk Street, LLC.

 The Foreign Debtors also own 45.25% of ODE Asia, LLC (EWE owns 32.71%), which, in turn, owns 100% of Oasis Net Leased Holdings LLC.  Oasis Net Leased Holdings LLC is a limited liability company, which holds the membership interests of 11 single-asset, special purpose entities comprising the so-called Net Leased Portfolio.  Each of the special purpose entities, whose membership interests are held by Oasis Net Leased Holdings LLC, are owned in part by other individual investors.   In total, over 30 individual and institutional investors have invested in one or more of the Oasis Group companies.

EWE  directly owns five commercial real estate properties in Massachusetts with more than 150,000 square feet leased to over 60 tenants.  Raymond Lee is the Chairman and President of EWE. He, his brother David C. Lee, and his sister Karen C. Lee, each own one third of EWE.  EWE  owns 99% of Oasis Northwoods, LLC, which is the record owner of a property located at 222 Rosewood Drive, Danvers, Massachusetts.  That entity is in receivership.

Two other properties, which are, or were, part of the Oasis Group, are implicated in the Turnover Motion by reason of guaranty agreements executed by Raymond Lee, which will be discussed in more detail below, namely 700 Longwater Drive, Norwell, Massachusetts and 50 Dunham Road, Beverly, Massachusetts. The property located at 700 Longwater Drive is owned by Oasis 700 Longwater LLC, and was obtained with financing from Column Financial, Inc., and the property located at 50 Dunham Road was owned by Fifty Dunham Road LLC. According to Nancy B. Adams ("Ms. Adams"), the principal of Broadwater Financial, in an Affidavit which was accepted into evidence:

> In December 2011, Fifty Dunham Road, LLC, which is managed by Oasis Development Enterprises, Inc., sold the real property at 50 Dunham Road, Beverly, Massachusetts, to a third party buyer for $2,300,000, after extensive marketing efforts by a commercial real estate broker. At the time of the sale, the property was subject to a mortgage loan from Eastern Bank, with an outstanding principal balance of $9,000,000. In connection with the sale, the borrower and the Bank reached an agreement whereby the borrower released the related tax, tenant improvement, capital improvement and leasing reserve accounts to the Bank, although the total of these accounts plus the net purchase price were less than the outstanding balance of the mortgage loan. In connection with the transaction, the Bank cancelled more than $4.3 million in debt, released its mortgage and *released Raymond C. Lee from his guaranty of the loan.*

(emphasis added). Profits produced by properties in the ODE and EWE portfolios are distributed proportionately to the individual investors. As will be discussed below, although many of the properties in the Oasis Group portfolio and the EWE portfolio are valued at less than the outstanding mortgage debt, the properties generate significant operating revenue.

The Foreign Debtors are employed by, and receive salaries from, OCI. In addition,

they realize income from the operations of the properties in the ODE and EWE portfolios

through the distribution of profits, as do the other investors in the Oasis Group and EWE.

Distributions are paid out of cash flow after debt service in whatever amount can be

prudently paid to investors while maintaining adequate cash reserves for the operation of

the properties and related expenses, including expenditures for leasing and improvements.

C. Properties Owned by ODE, EWE and Their Affiliates and Available Equity

Two exhibits constitute the only evidence of the value of the properties in the ODE

and EWE portfolios, and, thus, inferentially, the value of the Foreign Debtors' equity

interests, namely Exhibit 38 submitted by the Foreign Representatives, which shows, as of

August 1, 2009, total appraised values for the 22 properties in the ODE and EWE portfolios

at that time of $175,190,000, subject to loan balances totaling $228,081,635; and Exhibit 1

submitted by the US Companies which is the Affidavit of Ms. Adams.  Ms. Adams

separately valued 18 of the properties using either (i) a discounted cash flow calculation;

or (ii) a direct capitalization calculation based on certain assumptions regarding future

leasing activity at certain of the properties.[3] She explained that "[the discounted cash flow

method takes a stream of future net operating income and discounts that future series of

---

[3] As noted above, the Oasis Northwoods LLC property located at 222 Rosewood
Drive, Danvers, Massachusetts is in receivership.  Ms. Adams indicated that the
property located at 50 Dunham Road, Beverly, Massachusetts owned by Fifty Dunham
Road LLC was sold.  She did not explain why the Belkins/Tolman property in Lynn,
Massachusetts, owned by Goldblock Associates LLC, and the 600 Longwater Drive,
Norwell, Massachusetts property, owned by Oasis Longwater LLC, were not appraised.
The Debtors have equity interests of 56.36% and 38.85% in those limited liability
companies, respectively.

payments to present value by a market-based discount rate" and that she utilized discount

rates ranging from 9.5% to 13%. She also explained that "[t]he direct capitalization method

divides a single year's estimate of net operating income by a capitalization rate to

determine the value of an income generating property," with capitalization rates,

determined by the market, ranging from 7% to 9% for commercial real properties of the

type and markets where the properties are located. Ms. Adams provided the following

information about the Net Leased Portfolio, which is part of the Oasis Group portfolio:

> The net leased portfolio (the "Net Leased Portfolio") consists of eleven (11) properties, ten (10) of which are in Massachusetts and one of which is in Nevada. Each property in the Net Leased Portfolio is owned by a separate limited liability company, the membership interest in each of which is held by Oasis Net Leased Holdings LLC, which is itself a single member limited liability company. Ten of the special purpose limited liability companies in the Net Leased Portfolio are collectively the borrower under a single loan facility from Wells Fargo Bank, N.A., which assigned the loan to a CMBS trust, in the original principal amount of $120,000,000 (the "WFB Loan"). Administration of the loan is under the direction of a special servicer. One property within the Net Leased Portfolio, 7 Concord Farms, Concord, MA is undeveloped land. It is not included in the collateral package for the WFB Loan and the limited liability company which owns that parcel is not a borrower under the WFB Loan.

> As of January 1, 2012, the principal balance of the WFB Loan is $113,723,178. As reflected in the Valuation Report, the estimated value of the 10 Net Leased Portfolio Properties which secure the WFB Loan is $69,885,000. Accordingly, I estimate that there is substantial negative equity in the Net Leased Portfolio, in the amount of ($43,838,178).

With respect to the EWE portfolio, Ms. Adams stated that the portfolio secures a

loan in the original principal amount of $10,900,000 from Eastern Bank (the "Eastern Loan")

and that, as of January 1, 2012, the principal balance of the Eastern Loan was $10,248,806.

She explained the status of the loan as follows in her Affidavit:

> Due to the loss of a large tenant in the Sharon property and to declining rents and increasing vacancy in all properties, the cash flow after debt [service] turned negative in July 2010. The borrower paid the shortfall that now totals nearly $200,000. *The loan matured on September 1, 2011.* Loan payments continued to be made after maturity as negotiations continued to extend the loan maturity date. Terms of extension have been agreed and the Extension Agreement is expected to be executed before the end of January. The agreement provides for a reduction in the interest rate from 5.25% to 4.25% with payments [of] interest only. . . *As a condition of the modification of terms, two properties must be sold with closings occurring on or before July 31, 2012 and the balance sold or refinanced to pay off the loan by December 31, 2012.*

(emphasis supplied). Ms. Adams opined that the value of the five commercial properties in the portfolio is $13,034,000, leading to the conclusion that the owner's equity in the EWE portfolio is $2,785,194.

Ms. Adams also valued 10 Milk Street, Boston, MA, an 11-story Class B office and retail building in Boston, owned by Oasis Ten Milk Street LLC. According to Ms. Adams, the Milk Street Property secures a loan in the original principal amount of $58,000,000 from Merrill Lynch Mortgage Lending, Inc. ("Merrill Lynch"), which assigned the Loan to CMBS trust. Additionally, according to Ms. Adams, administration of the Milk Street Loan is under the direction of a special servicer. Ms. Adams opined that, as of January 1, 2012, the principal balance of the Milk Street Loan was $58,000,000 and that the value of the property is $45,735,000, resulting in "substantial negative equity in the Milk Street Property, in the amount of ($12,265,000)."[4]

---

[4] With respect to the financing, Ms. Adams specifically stated:

The existing $58 million loan was closed in April 2007 with a ten year term

With respect to the property located at 700 Longwater Drive, Norwell, Massachusetts, a two-story Class A suburban office building owed by Oasis 700 Longwater LLC, Ms. Adams stated that the property secures a loan in the original principal amount of $8,650,000 from Column Financial, Inc. ("Column Financial"), which assigned the loan to CMBS trust and that, as of January 1, 2012, the principal balance of the loan was $8,641,471. She opined that the value of the 700 Longwater Drive property is $7,510,000, resulting in substantial negative equity in the amount of ($1,131,471).

With respect to unencumbered property located at 7 Concord Farms, Concord, MA, Ms. Adams opined that the value was $528,000, resulting in owner's equity of $528,000.

D. The Testimony of Ms. Garzon:  The Loan Documents

The acquisition or refinancing of properties in the Oasis Group portfolio and the properties in the EWE portfolio, as well as several additional properties, were financed

---

and interest only payments.  The lender, Merrill Lynch, included the loan in a securitized pool.  In the spring of 2010, because there was insufficient income to cover operating expenses, debt service, and leasing expenses, the borrower requested that the loan be transferred to a Special Servicer in order to negotiate a modification of payment terms.  The borrower paid the shortfall in debt service that totaled more than $1.3 million to keep the loan current while negations [sic] proceeded.  *The Special Servicer agreed to reduce the interest rate from 6.125% to 3% as of November 2010 for a two year period with all excess cash flow after debt paid into the Leasing Reserve Account. The modification expires in October 2012.*  A significant amount of space will need to be leased during 2012 to generate sufficient income to cover debt at the contract rate.  With the competition continuing to offer above market tenant improvements and leasing commissions, there may be insufficient funds available to cover leasing costs.

(emphasis supplied).

through a complex series of promissory notes and mortgages. These documents, including guaranties executed by Raymond Lee, contain among other things, default provisions, equity transfer restrictions and other prohibitions that the Foreign Debtors and the US Companies cite in support of their opposition to the Turnover Motion. During the trial, Ms. Garzon referenced a number of pertinent provisions in her trial testimony which are discussed below.[5]

The single-asset, special purpose limited liability companies which comprise the Oasis Net Leased properties held by Oasis Net Leased Holdings LLC (itself wholly owned by ODE Asia LLC in which the Foreign Debtors hold 45.26% of the equity interests), with the exception of Oasis Seven Concord Farms LLC, executed a "Promissory Note Secured by Security Instrument" on November 14, 2005 in the sum of $120,000,000 in favor of Wells Fargo Bank National Association ("Wells Fargo") with a maturity date of December 5, 2015. The loan amount was allocated to each borrower pursuant to a separate schedule. The promissory note was secured by four mortgages and absolute assignments of rents and leases and security agreements with respect to the Massachusetts properties and one deed of trust and an absolute assignment of rents and leases and a security agreement with respect to the property located in Las Vegas, Nevada. The mortgage executed by the Concord Farms entities is illustrative as it contains typical default provisions in the agreements. Article 7 contains default provisions, captioned "Optional Default" and

---

[5] The loan documents were submitted into evidence as Exhibit 2 by the US Companies. The Court shall refer to additional pertinent provisions in its discussion.

"Automatic Default" at Article 7.1.a and 7.1.b, respectively.  Specifically, Article 7.1a.(ii),

labeled "Failure to Perform," provides an optional default in the event:

> Borrower or Mortgagor shall fail to observe, perform or discharge any of
> Borrower's or Mortgagor's obligations, covenants, conditions or agreements,
> other than Borrower's or Mortgagor's payment obligations, under the Note,
> this Mortgage or any of the other Loan Documents, and (aa) such failure shall
> remain uncured for 30 days after written notice thereof shall have been given
> to Borrower or Mortgagor, as the case may be, by Mortgagee or (bb) if such
> failure is of such a nature  that it cannot be cured within such 30 day period,
> Borrower or Mortgagor shall fail to commence to cure such failure within
> such 30 day period or shall fail to diligently prosecute such  curative action
> thereafter.

Additionally, Article 7.1a.(iii), captioned "Representations and Warranties," contains an

additional ground for Wells Fargo to declare an Optional Default:

> Any representation, warranty, certificate or other statement (financial or
> otherwise) made or furnished by or on behalf of Borrower,  Mortgagor, or a
> guarantor, if any, to Mortgagee or in connection with the Loan Documents,
> or as an inducement to Mortgagee to make the Loan, shall be false, incorrect,
> incomplete or  misleading in any material respect when made or furnished.

In addition to citing those specific events of default,[6] Ms. Garzon referenced Article 6.15

captioned, "Due on Sale/Encumbrance."  Specifically, she observed that Article 6.15.c.(i),

labeled "Prohibited Equity Transfers," provides:

---

[6]  The Foreign Debtors are in default under the loan documents.  Among the
automatic defaults at Article 7.1.b.(ii) is the failure "to effect a full  dismissal of any
involuntary bankruptcy petition under the Bankruptcy Code or other Debtor Relief
Law,"such as the Hong Kong bankruptcy proceedings,  that "in any way restrains or
limits Borrower or Mortgagor regarding the Loan or the Property, prior to the earlier of
the entry of an order granting relief sought in the involuntary petition or ninety (90)
days after the date of the filing of the petition." A similar provision in Article 7.b.(iii)
applies to guarantors, such as Raymond Lee, who executed a Limited Guaranty of the
Wells Fargo loan on November 14, 2005.

Mortgagor shall not cause or permit any Transfer of any direct or indirect legal or beneficial interest in a Restricted Party (collectively, a "Prohibited Equity Transfer"), including without limitation, . . . (C) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Transfer of a non-managing  membership interest or the creation or issuance of a new non-managing membership interests . . . .

Article 6.15.c.(ii) permits equity transfers and provides:

Notwithstanding the foregoing, none of the following Transfers shall be deemed to be a Prohibited Equity Transfer, so long as the Minimum Equity Requirement (defined below) remains satisfied following such Transfer: . . . (C) a Transfer, in one or a series of transactions, of not more than 49% of the stock, limited partnership interests or non-managing membership interests (as the case may be) in a Restricted Party to persons not owning such interests as of the Disbursement Date where such Transfer does not result in a change in management control in the Restricted Party . . . .

The term "Minimum Equity Requirement is defined as

(i) Raymond C. Lee, (ii) a Family Trust of Raymond C. Lee, (iii) the Estate of Raymond C. Lee or (iv) a Qualified Raymond Lee Family Member (defined herein) must continue to control the Mortgagor and the day-to-day operations of the Property and own at all times, directly or indirectly, at least a 30% interest in the Mortgagor.

A "Qualified Raymond Lee Family Member" is defined as "any of the spouse, descendants, heirs, legatees or devisees of Raymond C. Lee that are qualified for employment by Oasis Development Enterprises, Inc. in a managerial capacity equivalent to that of a managing director."

Article 4.4 of the mortgage governs the "Rights of Mortgagee upon Default."  It provides, in section 4.4.a., labeled "Disposition of Collateral":

14

Mortgagee may: (i) upon written notice, require the Mortgagor to assemble any and all of the Collateral and make it available to Mortgagee at a place designated by the Mortgagee; (ii) without prior notice, enter upon the Property or any  other place where the Collateral may be located and take possession of, collect, sell, lease, license and otherwise dispose of the Collateral, and store the same at locations acceptable to Mortgagee at Mortgagor's expense; or (iii) sell, assign and deliver at any place or in any lawful manner and bid and become purchaser at any such sale. . . . .

Ms. Garzon also testified about a "Mortgage, Assignment of Leases and Rents and Security Agreement" executed by Oasis Ten Milk Street, LLC to secure a $58,000,000 Loan Agreement dated April 18, 2007 provided by Merrill Lynch.  As stated by Ms. Garzon, Article 6, captioned "No Sale or Encumbrance" provides at Section 6.2 (a) the following:

Borrower shall not cause or permit a Sale or Pledge  of the Property or any part thereof or any legal or beneficial  interest therein nor permit a Sale or Pledge of an interest in any Restricted Party (in each case a Prohibited Transfer), other than pursuant to Leases of space and the Improvements to Tenants in accordance with the provisions of Section 4.13, without the prior written consent of lender.

The Loan Agreement contained the following definition of "Restricted Party" at Section 6.1: "Restricted party shall mean Borrower, Guarantor, any SPE Component Entity, any Affiliated Manager, or any shareholder,  partner, member or non-member manager, or any direct or indirect  legal or beneficial owner of Borrower, Guarantor, any SPE Component Entity, any Affiliated  Manager or any non-member  manager."   Pursuant to those provisions, Ms. Garzon testified that a transfer of the interests or shares of the Foreign Debtors would constitute a prohibited transfer. Nevertheless, at Section 6.3, the Loan Agreement set forth permitted transfers with the following caveat:

Notwithstanding anything to the contrary contained in this Section 6.3,

15

Raymond C. Lee must continue to own, directly or indirectly, at least a 25% interest in, and Control, Borrower, and remain the Guarantor under the Guaranty.

Article 10 of the Loan Agreement, captioned "Events of Default; Remedies" provided that any action under "any Creditors Rights Laws" against any managing member of Borrower or Guarantor would constitute an event of default, triggering the remedies set forth in Section 10.2 of the Loan Agreement.

Ms. Garzon testified about a $6,256,000 loan made by Column Financial to Oasis 700 Longwater LLC. referencing a Mortgage and Security Agreement dated November 20, 2003. She stated that Article 1, "Covenants of Borrower," at Section 1.13, captioned "Alienation and Further Encumbrances" provides at subsection (a)(2) the following:

In the case of a Borrower which constitutes a limited liability company, up to 33% of the non-managing membership interests in Borrower shall be freely transferrable. Up to 33% of any manager's interest or managing membership interest in such a Borrower may be transferred without the consent of Lender *so long as those persons responsible for the management and control of borrower and the property remain unchanged following such transfer.*

(emphasis supplied). The Loan Agreement further provided in Article II, "Events of Default" at Section 2.1.(f):

The occurrence of any of the following events shall be a default hereunder: . . .

There shall be a sale, conveyance, disposition, alienation, hypothecation, leasing, assignment, pledge, mortgage, granting of a security interest in or other transfer or further encumbrancing of the Property, Borrower or its owners, or any portion thereof or any interest therein, in violation of Section 1.13 hereof.

16

Insolvency of a managing member or guarantor also constituted an event of default pursuant to Section 2.1.(h).  Raymond Lee executed an Indemnity and Guaranty Agreement on November 6, 2009.

The Court takes judicial notice of its docket[7] and observes that none of the lenders, including Wells Fargo, Merrill Lynch, Column Financial, Eastern Bank, or CMBS trust, the assignee of Wells Fargo and Merrill Lynch, filed notices of appearance in the Chapter 15 cases, although the Court has no evidence that Wells Fargo, Merrill Lynch, Column Financial or Eastern Bank were given notice of the commencement of the Chapter 15 cases by the Foreign Representatives or by the Foreign Debtors.  In view of the status of the Oasis Ten Milk Street LLC loan and the EWE portfolio loan and Raymond Lee's status as president of both of Oasis Ten Milk Street Associates, ODE and EWE, as well as the provisions in the loan documents, the Court infers the lenders are aware of both the Hong Kong proceedings and the proceedings pending in this Court.  This inference is supported by the provisions in the Wells Fargo Limited Guaranty and the Column Financial Indemnity and Guaranty Agreement executed by Raymond Lee in which he agreed to provide year-end financial statements to the lenders upon written request.  Additionally, there was no evidence that any of the lenders filed contingent claims against Raymond Lee pursuant to their guaranties in the Hong Kong proceeding.

---

[7] The Court may take judicial notice of the documents in the debtor's file and those in the Court's own records. In re Hyde, 334 B.R. 506, 508 n. 2 (Bankr. D. Mass. 2005).  *See also* In re Dessources, 430 B.R. 330, 331 n. 5 (Bankr. D. Mass. 2010).

E. The Testimony of Ms. Garzon: Transfer Restrictions in the Articles of Organization and Operating Agreements[8]

Ms. Garzon testified about the Articles of Organization for ODE.  In particular, in her testimony, she referenced Article V, which set forth restrictions imposed upon the transfer of shares of stock of any class as follows:

1. Restriction on Transfer.  Except to the extent and in the manner provided herein or as provided by agreement among all the stockholders of the corporation and the corporation, a stockholder of the corporation may not sell, assign, transfer, pledge, hypothecate or otherwise dispose (including by gift or otherwise) of any of his shares of capital stock of the corporation ("Stock").

2. Exception for Authorized Transferees.  The restrictions of paragraphs 3 and 4 [reproduced below] of this Article V shall not apply to transfers of Stock to the following persons (herein "Authorized Transferees"):

(a) the stockholder as the sole trustee of a trust revocable by the stockholder alone; and

(b) a corporation, of which the stockholder transferring Stock owns, directly or indirectly, not less than a majority of the capital stock which is entitled to vote for the election of directors;

provided, that the Stock held by such Authorized Transferee shall remain subject to the provisions of Article V.

3. Voluntary Transfers. Neither a stockholder nor his Authorized Transferee may sell, assign, pledge or otherwise dispose of any shares of Stock, or any

---

[8] Ms. Garzon's testimony referenced specific provisions of the Articles of Organization for ODE and EWE, and she also testified about a representative Operating Agreement for ODE Asia LLC.  Although the Court has included the provisions she testified about here, the Articles and Operating Agreement themselves were submitted into evidence as part of Exhibit 2 submitted by the US Companies.  The Court shall discuss other relevant provisions later in this decision.

interest therein now held or hereafter acquired, without first giving written notice thereof to the corporation.  The written notice shall include the name of the transferee and all material terms of such transfer  and, in the case of a transfer for fair value, shall be accompanied by a copy of the bona fide written offer to purchase such Stock upon the terms set forth in the written notice. The written notice to the corporation shall be deemed for all purposes to give the corporation a first right of purchase (sometimes referred to as a right of first refusal) as provided herein.  If the corporation declines or fails to exercise its first right of purchase within the time provided, the stockholder may, within 60 days from the date said right terminates, transfer the Stock to the proposed transferee upon substantially the terms set forth in the original notice to the corporation.

Article V at Paragraph 4 sets forth "Transfer Events." A Transfer Event may occur when a stockholder is subjected to an involuntary petition [clause iii]or when "a *stockholder* or Authorized Transferee is subject to a  judgment, court order or decree or *by operation of law is otherwise required to transfer Stock to other than an Authorized Transferee* [clause iv]." (emphasis supplied). In addition, Paragraph 4(b) provides:

> . . . A stockholder shall, within 10 days of the occurrence of a Transfer Event specified in clauses (ii) through (iv) of subparagraph (a) give written notice thereof to the corporation.  If the corporation declines or fails to exercise timely its first right of purchase as provided in paragraph 5 [setting forth the First Right of Purchase], then the legal representative, beneficiary, trustee, assignee, receiver or other transferee who obtained the Stock by reason of the Transfer Event may retain the Stock, subject to the provisions of this Article V.

Ms. Garzon also testified about the transfer restrictions contained in the Articles of Organization of EWE.  Paragraph 5 provides the following:

> Any stockholder, including the heirs, assigns, executors or administrators of a deceased stockholder, desiring to sell, transfer or pledge such stock owned by him or them, shall first offer it to the corporation through the Board of Directors in the manner following. . .

19

No shares of stock shall be sold or transferred on the books of the corporation until these provisions have been complied with, but the Board of Directors may in particular instance waive these requirements.

Ms. Garzon testified about similar provisions applicable to the Amended and Restated Operating Agreement for ODE Asia, LLC. At paragraph 6, captioned "Substitution and Assignment of a Member's Interest," the Agreement provides:

(c) <u>All Other Transfers</u>. Except as otherwise provided in this Section 6, no member may sell, assign, give, pledge, hypothecate, encumber or otherwise transfer, including, without limitation, *any assignment or transfer by operation of law or by order of court (in each instance a "Transfer"), such member's interests in the LLC or any part thereof, or in all or any part of the assets of the LLC, without the written consent of the manager and any purported transfer without such consent ( a "Prohibited Transfer") shall be null and void and of no effect whatsoever.*

Notwithstanding the foregoing, if the LLC is required to recognize a Prohibited Transfer the interest so transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred interest (and the transferee shall not thereby become a member of the LLC), which allocations and distributions may be applied (without limiting any other legal or equitable rights of the LLC) to satisfy any duties, obligations or liabilities for damages that the transferor or transferee of such interest may have to the Partnership.

(emphasis added). Ms. Garzon, in her testimony, added that the provisions in ODE Asia, LLC's Operating Agreement with respect to transfer restrictions are typical for the single-asset, special purpose entities in the Oasis Group portfolio. She further testified that Raymond Lee's bankruptcy proceeding would constitute a default under all of the loan documents submitted into evidence, citing Section 7.1(b)(iii) of the Wells Fargo Mortgage; section 10.1(f)(ii) of the Merrill Lynch Mortgage and Section 2.1(h) of the Column Financial loan documents. Ms. Garzon further observed that certain transfers are prohibited without the written consent of the manager, namely ODE, adding that decisions with respect to that

20

entity are made by its Board of Directors, which is comprised of the Foreign Debtors, Karen Wang and Phillip Lee. She testified that those individuals make decisions about whether to approve transfers in connection with ODE Asia LLC. With respect to EWE, Ms. Garzon testified that it restricted transfers absent approval of its Board of Directors, whose members are Raymond Lee, Karen Lee, and David Lee, siblings who each hold 1/3 interest.

F. The Amended Order Granting Recognition of Foreign Main Proceedings and the Parties' Stipulations

Approximately 16 months after the filing of the Chapter 15 petitions, this Court, on April 7, 2011, entered an Amended Order Granting Recognition of Foreign Main Proceedings and Related Relief, attached to which was a Stipulation executed by the Foreign Debtors, the Foreign Representatives and the US Companies. The Amended Order Granting Recognition provided, *inter alia,* that this Court has jurisdiction to consider the matter pursuant to 28 U.S.C. §§ 157, 1334 and that Hong Kong is the center of main interest of the Foreign Debtors. Under Section 30A of the Hong Kong Bankruptcy Ordinance, individual bankruptcy cases, such as those of the Foreign Debtors, commence on the day the individuals are adjudged bankrupts and continue for a period of four years when the bankrupts are discharged. As noted above, the Foreign Debtors were adjudged bankrupts on August 31, 2009. The Foreign Representatives may obtain an extension of that four year period, however.

The Amended Order provided that "the Foreign Representatives are hereby entrusted with the administration, realization, and distribution of all of the Foreign

Debtors' assets located within the territorial jurisdiction of the United States, pursuant to

11 U.S.C. § 152l(a)(5)," subject "in all respects to the terms and conditions of the

Recognition Stipulation." The "Stipulation Regarding Verified Petitions Seeking Entry of

Order Recognizing Foreign Main Proceedings Pursuant to 11 U.S.C. §§ 1515 and 1517 and

Relief Pursuant to 11 U.S.C. §§ 1520 and 1521," which was attached to the April 7, 2011

Amended Order, in pertinent part, provides:

> As of the date of this Stipulation, the US Companies estimate that the Foreign Debtors are owed the following amounts, subject to any defenses and/or offsets: (a) $47,354.95 in salary; (b) unpaid distributions from Oasis Development Enterprises, Inc. ("ODE") of $952,548.69; (c) amounts owing from ODE on a promissory note line of credit of $1,572,894.53; and (d) unpaid distributions from the US Companies other than ODE of $748,272.97. As soon as practicable, the US Companies will pay to the Foreign Representatives at the Foreign Representatives' direction the amounts described in subparagraphs (a) and (d) of this paragraph 2, which amount is estimated to be $795,627.92, and which represents the salary owed to the Foreign Debtors, and the unpaid distributions owed to the Foreign Debtors from the US Companies other than ODE.
>
> For the duration of the Foreign Debtors' bankruptcy proceedings in Hong Kong (or until further Bankruptcy Court order or agreement of the Parties), all salary due and owing to the Foreign Debtors by the US Companies shall be paid to the Foreign Representatives at their direction.
>
> For the duration of the Foreign Debtors' bankruptcy proceedings in Hong Kong (or until further Bankruptcy Court order or agreement of the Parties), to the extent that the US Companies make distributions to equity holders, the Foreign Debtors' pro rata share of all such distributions shall be paid to the Foreign Representatives at the Foreign Representatives' direction.
>
> For the duration of the Foreign Debtors' bankruptcy proceedings in Hong Kong (or until further Bankruptcy Court order or agreement of the Parties), to the extent that the US Companies make payments on any other amounts owed to the Foreign Debtors, including payments by ODE on the promissory note identified in paragraph 2 above, all such payments shall be made to the

Foreign Representatives at the Foreign Representatives' direction.

\*\*\*

Absent further order of the Bankruptcy Court or agreement of the Parties, the Foreign Representatives shall not take any action (other than commencing proceedings in the Bankruptcy Court) with respect to the Foreign Debtors' equity interests in the US Companies.  All Parties' rights are reserved with respect to the equity interests - including any Parties' rights  to bring an action in the US with respect to the equity interests. The equity interests are subject to the automatic stay imposed by § 1520(a)(1).

 Insofar as the Debtors are guarantors of indebtedness of the US Companies, nothing herein prevents either of such Debtors as guarantors from acquiescing to any restructuring of  the underlying indebtedness owing by any  of  the  US Companies to its respective lenders, or reaffirming such guarantees, provided that such acquiescing or reaffirming does not create new financial obligations, or increase the principal amount of guaranteed obligations, of the Debtors, and provided that such acquiescing or reaffirming shall not constitute a determination that such acquiescing or reaffirming is effective to bind the Foreign Representatives. The Debtors or the U.S. Companies shall provide the Foreign Representatives with reasonable advance notice of any such restructuring contemplated by this paragraph, and copies of any documents executed in their personal capacity with respect to any such restructuring.

*United States law will govern any action taken by the Foreign Representatives against the US Companies, including, without limitation, any attempt by them to liquidate or otherwise realize upon the Foreign Debtors' interest(s) in the US Companies, or any challenge to the operation or management of the US Companies. Any such dispute will be brought exclusively in the courts of the United States.*

\*\*\*

The Foreign Debtors shall provide the Foreign Representatives and their professionals, including, but not limited to, a local outside accounting firm hired by the Foreign Representatives, with reasonable access to all of the books and records of the US Companies for the purpose of performing a review of the finances of the US Companies and monitoring the US Companies going forward.

(emphasis supplied).

In conjunction with the Turnover Motion, the parties executed a Stipulation Resolving Stipend Motion and Partially Resolving Turnover Motion, which the Court approved on February 6, 2012. Pursuant to that stipulation, the parties significantly altered their April 7, 2011 stipulation and agreed, in relevant part, to the following:

> As of the date that this stipulation is approved by the Court, all salary, fees including directors' fees, commissions and other amounts earned by virtue of work performed by the Foreign Debtors ("Earned Income") shall be paid to the Foreign Debtors, and all U.S. Earned Income shall no longer be paid to the Foreign Representatives, as formerly provided in paragraph 3 of the Recognition Order Stipulation. Provided, however, that any U.S. Earned Income earned by the Foreign Debtors prior to the date of this stipulation that has not already been turned over to the Foreign Representatives shall be turned over to the Foreign Representatives as soon as is practicable upon approval of this stipulation by the Bankruptcy Court. To the extent the Foreign Debtors' joint gross Earned Income exceeds $144,000.00 USD for any one payment cycle (measured from March 1 to the end of February), any such excess shall be paid to the Foreign Representatives. The Foreign Representatives shall be responsible for the payment of all taxes imposed on the portion of any Earned Income that the Foreign Debtors turn over to the Foreign Representatives. The Parties reserve their respective rights to apply for an order from the Hong Kong Bankruptcy Court increasing or decreasing the amount of Earned Income that the bankruptcy estate may claim. For the avoidance of doubt, nothing in this stipulation shall affect the Foreign Representatives' right to seek an "income payments order" pursuant to Section 43E of the Hong Kong Bankruptcy Ordinance.

> This stipulation does not affect the following issues addressed in the Turnover Motion: . . . the equity interests held by the Foreign Debtors in the corporations Oasis Development Enterprises, Inc., Oasis Consulting, Inc., East-West Enterprises Co., Ltd., and their corporate and limited liability company affiliates . . . .

> The Recognition Order Stipulation remains in force except to the extent inconsistent with this stipulation.

In her Affidavit which was accepted into evidence at the trial, Ms. Garzon, recognized the agreement of the parties, stating that "[i]n compliance with the stipulation, the US Companies have to date [February 1, 2012] paid a total of $2,797,353.38 to the Foreign Representatives."

G. The Testimony of the Foreign Representative

Mr. Lees testified that, although the Foreign Representatives agreed to abide by the decisions of courts in the United States, he had a duty under Hong Kong law to take possession of all assets of the bankrupts, including shares in companies, adding that the Foreign Representatives "like to take an active part in decision making in these companies" with the goal of maximizing value. He stated: "[w]e're not short-term in this situation; we're long term. We'd be very happy to stay in here for five, six, seven or eight years if we need to see the values improve." Concluding his direct testimony, he testified that the Foreign Representatives intended to keep the Chapter 15 proceedings open as long as the Hong Kong proceedings were open.

On cross-examination, Mr. Lees explained that under the Hong Kong Bankruptcy Ordinance it was possible to obtain an extension of the applicable four-year period for bankruptcy cases in Hong Kong upon application and the establishment of "a good reason for that extension," adding that in most cases all the assets are collected and distributed

25

well within the statutory four year period.[9]

Mr. Lees explained his testimony that the Foreign Representatives would like to take

"an active part in decision making" as follows:

> Well, certainly it would be having a look at any transaction that was
> contemplated that - - for sale of properties. We would like to have some
> contact with some of the lenders as well. I believe that, you know, we could
> give some credibility to the situation. Through our statute one of our major
> creditors in Hong Kong is a major property developer. He [sic] certainly has,
> you know, has a great deal of credibility.

Mr. Lees indicated that, although he could not criticize the decisions made with respect to

the sale of the 50 Dunham Road property in Beverly, Massachusetts or the loan

modification involving Ten Milk Street, Boston, Massachusetts, the Foreign Representatives

were only made aware of the decisions affecting those properties after the fact.  He

expressed a desire for "some strict corporate governance . . . so that certain things are

relayed to us and before things happen."

With respect to his duties to the other non-debtor shareholders or members of the

US Companies, Mr. Lees testified that the Foreign Representatives would always consider

the interests of the other investors in the companies, adding "we certainly can't do

---

[9] Under Section 30A(3) and (4)(a) of the Hong Kong Bankruptcy Ordinance, the
court may order the four-year period extended if "the bankrupt is likely within 5 years
of the commencement of the bankruptcy to be able to make a significant contribution
to the estate."  Additionally, under Section 30A(8) and (9), after the granting of a
discharge, the bankrupt may be required to cooperate with the trustee, and the court
may condition the discharge upon entry of an order requiring the bankrupt "to continue
to make contributions to his estate in such amount and for such period as it considers
appropriate but not exceeding a period of 8 years from the date the bankruptcy order
was made."

something which might severely jeopardize the interests of other parties." He testified that
he could not envision a scenario in which the interests of the creditors of the Foreign
Debtors would conflict with the interests of the holders of the other equity interests, other
than the Foreign Debtors, in the US Companies.

With respect to the vesting of the Foreign Debtors' ownership interests in the US
Companies in the Foreign Representatives, Mr. Lees stated that he had not attempted to
sell the Foreign Debtors' shares in ODE or EWE and had not received any unsolicited
offers, reiterating that "any sale would have to be conducted according to any restrictive
rights of those shares." Mr. Lees also testified that he had not considered managing ODE
if the Turnover Motion were granted. He stated, however, that he would like to receive
more information about management decisions than what the Foreign Representatives
have been receiving in the form of "quarterly reports and occasional management
accounts." Mr. Lees added: "It's not a matter of 'carrying on the business' of the bankrupts.
It's a matter of taking control of the various assets." Referencing Section 61(a) of the Hong
Kong Bankruptcy Ordinance, he testified that that provision permitted him to, among other
things, carry on the business of the bankrupts as far as may be necessary for the beneficial
winding up of the same or to allow the bankrupt to restructure the business, while
recognizing that the Foreign Debtors do not operate businesses, rather they own equity
interests in companies that are in business that do not have employees. Because Section
61 permits the Foreign Representatives to engage in certain activities "with the permission
of the creditors' committee," Mr. Lees testified that Winchesto and Value Partners, as

27

members of the creditors' committee, believe that the Foreign Debtors' equity interests should be vested in the Foreign Representatives and encouraged the filing of the Turnover Motion.

Upon redirect examination, Mr. Lees testified that, if the Turnover Motion were denied, it likely would constitute grounds for extending the bankruptcies in Hong Kong "because there's outstanding business basically" and "[a]ll the affairs of the bankruptcy [sic] . . . must be tidied up before the completion of the bankruptcy."

## III. POSITIONS OF THE PARTIES

### A. The Foreign Representatives

The Foreign Representatives, relying upon the Declaration of Richard David Hudson, a partner in the Litigation and Dispute Resolution Department of Deacons, a law firm located in Hong Kong, which represents them, maintain that under Hong Kong law the equity interests, and in particular shares of stock, vest in the them as trustees of the bankrupts in the Foreign Main Proceeding and that that vesting by operation of Hong Kong law does not constitute a transfer implicating the transfer restrictions in the Articles of Organization of ODE or other applicable Operating Agreements or Articles of Organization.  In their view, regardless of any transfer restrictions affecting the shares of stock owned by the Foreign Debtors in ODE or EWE,  under Hong Kong law, upon the commencement of the bankruptcy and their appointment as trustees, the shares vested in them as trustees pursuant to Sections 43, 53 and 58 of the Bankruptcy Ordinance.  The Foreign Representatives rely on Section 58(3) of the Hong Kong Bankruptcy Ordinance

28

which provides that property of the debtor vests in the trustee without, inter alia, "any conveyance, assignment or transfer whatever." Thus, in their view, pursuant to Hong Kong law, the Foreign Debtors' equity interests automatically vested in the Foreign Representatives when they were appointed as joint trustees, regardless of any transfer restrictions. Because the Bankruptcy Ordinance expressly provides that the vesting of property does not constitute a transfer, the Foreign Representatives maintain that no corporate transfer restrictions can apply. Stated another way, if vesting does not involve a transfer, no transfer restrictions apply to vesting.

The Foreign Representative also rely upon Section 53(3) of the Bankruptcy Ordinance which provides "Where any part of the property of the bankrupt consists of stock, . . . shares, or any other property transferable in the books of any company, office or person, the trustee may exercise the right to transfer the property to the same extent as the bankrupt might have exercised it if he had not become bankrupt." In addition, the Foreign Representatives recognize Section 43(5) of the Bankruptcy Ordinance which provides that "property comprised in a bankrupt's estate is so comprised subject to the rights of any person other than the bankrupt (whether as a secured creditor of the bankrupt or otherwise) in relation thereto . . . ," although they maintain that Section 43(5) does not and cannot operate to permit third parties to exercise transfer restriction rights to prohibit the vesting of shares in a bankruptcy trustee because the vesting of shares does not constitute a transfer pursuant to Section 58 of the Bankruptcy Ordinance. Alternatively, the Foreign Representatives argue that even if this Court were to view the vesting of the equity

29

interests in them as an event that would trigger the "transfer" restrictions in the Articles of Organization or LLC Operating Agreements, they assert that those restrictions cannot be enforced because doing so would frustrate the underlying purpose and guiding principles of Chapter 15.

The Foreign Representatives argue that the provisions of Hong Kong Bankruptcy Ordinance are consistent with the provisions of the Bankruptcy Code. Although they do not dispute that they must operate within the confines of the applicable Articles of Organization and Operating Agreements and abide by provisions relating to transfer restrictions because they "step into the shoes" of the Foreign Debtors, they assert that they must have the ability to make decisions commensurate with the estates' equity interests, citing In re First Protection, Inc., 330 B.R. 821, 830 (B.A.P. 9th Cir. 2010) (" We conclude that all of Debtors' contractual rights and interest in Redux [a corporation] became property of their estate under § 541(a)(1) by operation of law when they filed their petition. Section 541(c)(1)(A) overrides both contract and state law restrictions on the transfers or assignment of Debtors' interest in Redux in order to sweep all their interests into their estate. . . . Accordingly, the restrictions Debtors point to under the operating agreement or the Arizona LLC Act did not prevent the vesting of their contractual rights in their bankruptcy estate.").

The Foreign Representatives conclude that the equity interests are property of the Hong Kong bankruptcy estate and that they should have the authority to control those equity interests consistent with the Foreign Debtors' ownership of approximately 72% of

ODE, which manages the Oasis Group portfolio. With respect to EWE, in which Raymond

Lee is only a one-third equity interest holder, they contend they would have whatever

rights he would have to participate in the governance of EWE, especially as Raymond Lee

is President of EWE and there is a single loan, which has matured, that governs all the

properties in the EWE portfolio.  As noted above, Ms. Adams, in her Affidavit, indicated

that the loan matured in September of 2011 and that there is a forbearance agreement

which requires EWE to sell two of the five properties by June 30, 2012 and to sell as many

of the other three properties as may be necessary to satisfy the loan in full by the end of

2012.

The Foreign Representatives emphasize that their activities are governed by the law

of Hong Kong; that they are rational economic actors charged with maximizing the value

of the equity interests for the estate; that they intend to engage professionals to protect and

maximize the value of the equity interests; and that their interests are not adverse to those

of the other interest holders in the US Companies.  Moreover, the Foreign Representatives

contend that the provisions of Chapter 15, i.e.,  11 U.S.C. §§ 1501, 1521(a)(5) and 1521(b),

pre-empt state law transfer restrictions that would prevent this Court from entrusting the

Foreign Debtors' equity interests to the them.  They argue that this conclusion is valid

because the result – the vesting of the assets in the Foreign Trustees – is the same result that

would occur in a Chapter 7 case through the operation of 11 U.S.C. §541(c)(1).[10]  They rely

---

[10] *See* <u>Tart v. Commonwealth of Mass.</u>, 949 F.2d 490, 500 (1st Cir. 1991) (Federal
preemption applies where "the federal statute and a state statute are in direct conflict . .
. because enforcement of the state statute would frustrate the congressional purpose

upon principles of comity and cooperation embedded in Chapter 15 and urge this Court

to avoid entering any orders which would permit the Foreign Debtor to shield assets in the

United States from foreign creditors through contractual arrangements - - something that

they could not do in a Chapter 7 case.

The Foreign Representatives reject the arguments of the Foreign Debtors and the US

Companies that defaults under the loan documents compel denial of the Turnover Motion.

Noting the absence of testimony or other evidence from representatives of the lenders, the

Foreign Representatives observe that the Hong Kong proceeding is itself a default and that

the EWE loan is in default and the subject of a forbearance agreement.  They point to the

record which establishes that the lenders have not been aggressive in enforcing default

provisions applicable to the Oasis Group and EWE portfolios, noting that the Foreign

Debtors have been successful in negotiating forbearance agreements.

The Foreign Representatives also discount the provisions in the loan documents

about which Ms. Garzon testified.  They observe that the US Companies are already in

default because the Lees were adjudged bankrupts under Hong Kong law.  Moreover, they

note that the EWE loan has matured and is the subject of a forbearance agreement which

---

underlying the federal statute.") (citing Pacific Gas & Electric Co. v. State Energy
Resources Conservation & Dev. Comm'n, 461 U.S. 190, 204 (1983)); *see also* Patriot
Portfolio, LLC v. Weinstein, 164 F.3d 677, 682-83 (1st Cir. 1999) ("[s]tates may not pass
or enforce laws to interfere with or complement the Bankruptcy Act or to provide
additional or auxiliary regulations.")(quoting Int'l Shoe Co. v. Pinkus, 278 U.S. 261, 265
(1929)).

requires the sale of properties,[11] as well as the receivership affecting the property owned by Oasis Northwoods LLC, located on Rosewood Drive in Danvers, Massachusetts. Additionally, with respect to the 50 Dunham Road property in Beverly, Massachusetts, they cite the forgiveness of $4 million in debt when the property was sold. In short, the Foreign Representatives maintain that the US Companies and the Foreign Debtors produced no credible evidence about what the lenders would do if the Turnover Motion were allowed, adding that the existing evidence is that lenders have been working with the borrowers, obviating any notion of the existence of a "real risk," particularly where the Foreign Representatives are insolvency professionals.

With respect to that requirement of Chapter 15 that relief may be granted pursuant to section 1521 only if the interests of creditors and other interested entities are "sufficiently protected," 11 U.S.C. § 1522(a), the Foreign Representatives maintain that under In re Atlas Shipping A/S, 404 B.R. 726, 740 (Bankr. S.D.N.Y. 2009), sufficient protection is determined with reference to whether the law of the foreign jurisdiction protects creditors and parties in interest. They maintain sufficient protection exists here because of the striking similarity between the Hong Kong Bankruptcy Ordinance and the Bankruptcy Code together with their acknowledgment that they will be bound by applicable transfer restrictions.

---

[11] Because the forbearance agreement with the lender requires EWE to sell properties, the Foreign Representatives maintain that they have a duty under Hong Kong law to ensure the value of the assets and distributions. Accordingly, they argue they should be involved in the sale process and "have a say in the distribution of sale proceeds to the same extent as every other equity holder in EWE."

33

B. The Foreign Debtors and the US Companies

The Foreign Debtors adopted and joined the arguments advanced by the US Companies. Accordingly, the Court shall refer to the US Companies in summarizing the positions advanced by both the US Companies and the Foreign Debtors. The US Companies, referencing the parties' Stipulation Regarding Verified Petitions Seeking Entry of Order Recognizing Foreign Main Proceedings, observe that United States law applies to disputes involving the US Companies and that those disputes must be brought in United States courts. The US Companies rely upon the provisions of the Stipulation Regarding Verified Petitions Seeking Entry of Order Recognizing Foreign Main Proceedings dated February 25, 2011, which provide, in summary, that absent further order of this Court or agreement of the parties, the Foreign Representatives shall take no action with respect to the equity interests. They insist that the rights of parties in the US Companies should be determined under United States law and Chapter 15 of the Bankruptcy Code, which provide for the protection of the interests of the Debtors and the US Companies, a goal embodied in 11 U.S.C. § 1522.

The US Companies emphasize that in addition to the Foreign Debtors the companies have approximately 30 other shareholders comprised of 19 individuals and entities. They urge the Court to recognize that those individuals and entities have invested over $34 million in the properties. They contend that the vesting of the equity interests in the Foreign Representatives will constitute transfers by operation of law which are subject to the share transfer restrictions in the Articles of Organization which should be upheld. In

34

the alternative, they assert that the type of turnover sought by the Foreign Representatives,
namely full and permanent ownership of the Foreign Debtors' shares in ODE and EWE,
will trigger the transfer restriction provisions.  They differentiate between the Hong Kong
Foreign Representatives being in charge of the portfolios and potentially causing the
liquidation  of the companies through control over the board of directors and ownership
of the stock. They add that the Foreign Debtors' ownership of stock in closely-held
corporations does not equal and should not equal outright management of the portfolio
companies, particularly where the companies have been operated in the interests of all
shareholders, all income has been distributed in accordance with the parties' stipulations,
and problems can be addressed through the commencement of complaints for violations
of fiduciary duties or the automatic stay.

The US Companies also insist that the share transfer restrictions set forth in the
Articles of Organization of ODE and EWE must be recognized, while observing that this
Court can and should condition the relief sought in the Turnover Motion to comport with
the provisions of the Stipulation Regarding Verified Petitions which requires that any
disputes relative to transfers of the Foreign Debtors' equity interests or the exercise of
rights inherent in full and complete ownership of those equity interests should be brought
to this Court.  In other words, the US Companies argue that the Chapter 15 proceedings
should remain open to the parties in interest in the United States who are concerned about
having the Foreign Representatives liquidate the companies themselves.

The US Companies contend that the critical issue is whether the protections for

other shareholders embodied in the transfer restrictions apply to the Foreign Representatives when they merely hold stock, or only when they elect to eventually, if ever, transfer the Foreign Debtors' equity interests to third parties.  They rely on the Section 43 of the Hong Kong Bankruptcy Ordinance, arguing that the property rights that are not violative of Article V of the transfer restrictions are already being granted to the Foreign Representatives in the form of income distributions and receipt of information which all shareholders receive.

The US Companies maintain that the interests of their equity holders will not be sufficiently protected because the operation of the companies will be directly influenced by the Foreign Representatives, despite the testimony of Mr. Lees that the Foreign Representatives have a long-term view and would be "benevolent overlords" with respect to the equity interest holders.  In sum, the US Companies contend that denial of the Turnover Motion is warranted,  adding that the Foreign Representatives can seek further relief in this Court in the event there is "any particular thing that they want to do or prohibit us from doing at the company level" in the future.  They add that interference with the ownership structure and management should not be countenanced.

After the evidentiary hearing, the Foreign Debtors and the US Companies submitted the Declaration of William M.F. Wong, a Barrister-at-Law and a member of chambers of Des Voeux Chambers, resident in Hong Kong (the "Wong Declaration").  In reliance upon the Wong Declaration, they advanced additional arguments. The maintain that the Wong Declaration confirms that (i) the vesting of the Equity Interests in the Foreign

Representatives under Hong Kong bankruptcy law did not effect a transfer of all of the

Debtors' rights with respect to the Equity Interests, and (ii) the Foreign Representatives'

right to exercise ownership and control of the Equity Interests is limited by the stock

transfer restrictions in the US Companies' organizational documents that are enforceable

under Massachusetts law.  They add that the Foreign Representatives overstate the nature

and effect of vesting under the Hong Kong Bankruptcy Ordinance because, in their view,

the Hong Kong law requires more than mere vesting to enable the Foreign Representatives

to exercise full ownership and control of the equity interests.  To obtain full ownership and

control of the equity interests, they maintain that the Foreign Representatives must comply

with any applicable stock transfer procedures, adding that for a Hong Kong company,

which ODE, EWE and the limited liability companies are not, one such procedure is

registration. They observe that in Hong Kong, before a trustee can exercise all rights of a

shareholder in a Hong Kong corporation, he "must be registered as a shareholder in the

company's register of members" so that the mere vesting of the equity interests does not

transfer full rights in the equity interests.

　　　　The US Companies further argue that this second stage requires compliance with

the US Companies' share transfer procedures and legal requirements such as, in Hong

Kong, registration.  Noting that the Foreign Representatives state that because "the vesting

of property does not constitute a transfer, it follows that no transfer restrictions can apply,

the US Companies argue that "[t]his utterly misstates the dispute and ignores the relief

actually sought, because, while the transfer restrictions may not apply to the first stage of

vesting of the equity interests, they do apply to this second stage.  Citing Section 43(5) of

the Bankruptcy Ordinance, which expressly provides that the equity interests vest in the

Foreign Representatives "subject to the rights of any person other than the bankrupt with

respect to [the equity interests]," they conclude that the requirements and prerequisites

applicable to a share transfer under a company's charter apply to a transfer to the Foreign

Representatives, not only to a transfer by them.

## IV. DISCUSSION

A. <u>Applicable Law</u>

The Turnover Motion, through which the Foreign Representatives seek "to

determine whether holding the Foreign Debtors' equity interests  in trust for the benefit

of creditors (in the hope that the market will rebound) or conducting a public sale,"

implicates both the Hong Kong Bankruptcy Ordinance and Chapter 15 of the Bankruptcy

Code.  Section 103(a) of the Bankruptcy Code provides in relevant part: "Except as

provided in section 1161 of this title, chapters 1, 3, and 5 of this title apply in a case under

chapter 7, 11, 12, or 13 of this title, and this chapter, sections 307, 362(o), 555 through 557,

and 559 through 562 apply in a case under chapter 15."  11 U.S.C. § 103(a).  Accordingly,

neither section 541(a) nor 541(c)(1) are applicable to a determination of property of the

Hong Kong bankruptcy estates, and the determination of property of the estates must be

made under Hong Kong law.   Notably, were section 541(c) to apply, the transfer

restrictions set forth in the Articles of Organization and Operating Agreements would be

38

unenforceable.[12]

The provisions of Chapter 15 of the Bankruptcy Code support a determination that the Hong Kong Bankruptcy Ordinance governs what constitutes property of the Foreign Debtors' bankruptcy estates and the Foreign Representatives' rights with respect to that property, subject to protections set forth in that statute and the Bankruptcy Code. Section 1501 of the Bankruptcy Code provides that the purpose of Chapter 15 is to facilitate cooperation between US and foreign courts and representatives. 11 U.S.C. § 1501(a).[13]

---

[12] Section 541(c) provides:

(c)(1) Except as provided in paragraph (2) of this subsection, *an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument*, or applicable nonbankruptcy law–

> (A) *that restricts or conditions transfer of such interest by the debtor*; or
>
> (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

(2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

11 U.S.C. § 541(c) (emphasis supplied).

[13] Section 1501(a) provides:

(a) The purpose of this chapter is to incorporate the Model Law on

According to the court in <u>SNP Boat Servs. S.A. v. Hotel Le St. James</u>, No. 11-cv-62671, __

F.Supp.2d __, 2012 WL 1355550 (S.D. Fla. April 18, 2012),

> Chapter 15 replaced § 304 of the U.S. Bankruptcy Code, [and] "many of the
> principles underlying § 304 remain in effect under chapter 15." <u>In re Atlas
> Shipping A/S</u>, 404 B.R. at 739: *see also* <u>In re Artimm, S.r.L.</u>, 335 B.R. 149,
> 159–60 (Bankr. C.D. Cal. 2005) ("[T]he chapter 15 regime looks somewhat
> different from that applicable to this case under § 304. However, there is one
> provision that is strikingly similar. As under § 304, § 1521(b) authorizes the
> court, upon the request of the foreign representative, to entrust the
> distribution of all or part of the debtor's U.S. assets to the foreign
> representative."); Leif M. Clark & Karen Goldstein, *Sacred Cows: How to Care
> for Secured Creditors' Rights in Cross–Border Bankruptcies*, 46 Tex. Int'l L.J. 513,
> 524 (2011) ("Not surprisingly, the case law under former § 304 is still relevant

--------

> Cross-Border Insolvency so as to provide effective mechanisms for dealing
> with cases of cross-border insolvency with the objectives of--
>
> (1) cooperation between--
>
>> (A) courts of the United States, United States trustees,
>> trustees, examiners, debtors, and debtors in possession; and
>>
>> (B) the courts and other competent authorities of foreign
>> countries involved in cross-border insolvency cases;
>
> (2) greater legal certainty for trade and investment;
>
> (3) fair and efficient administration of cross-border insolvencies that
> protects the interests of all creditors, and other interested entities,
> including the debtor;
>
> (4) protection and maximization of the value of the debtor's assets; and
>
> (5) facilitation of the rescue of financially troubled businesses, thereby
> protecting investment and preserving employment.

11 U.S.C. § 1501(a).

to the interpretation of Chapter 15, especially as it concerns the remedies available to a foreign representative once recognition has been granted."). Like the old § 304, and in many ways to an even greater degree, Chapter 15 directs courts to be guided by principles of comity. *Compare* 11 U.S.C. § 304 (repealed 2005) ("In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with . . . (5) comity . . .."), with 11 U.S.C. § 1507 ("In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance [is] consistent with the principles of comity . . . ."), and id. § 1509(b) ("If the court grants recognition under section 1517, and subject to any limitations that the court may impose consistent with the policy of this chapter . . . a court in the United States shall grant comity or cooperation to the foreign representative.").

SNP Boat Servs. S.A., 2012 WL 1355550 at *8.

Under Section 58 of the Hong Kong Bankruptcy Ordinance, property of the bankrupt vests in an Official Receiver upon the making of a bankruptcy order. Thereafter, upon the appointment of a trustee, the property of the bankrupt, vests in the trustee. In this case, the property of Raymond and Priscilla Lee vested in the Foreign Representatives. The bankrupt's estate is defined at Section 43(a1)(a) of the Bankruptcy Ordinance, which provides that property of the estate is comprised of "all property belonging to or vested in the bankrupt at the commencement of the bankruptcy." It also includes "any property which by virtue of any of the provisions of this Ordinance is comprised in that estate or is treated as falling within paragraph (a)." Id. at 43(1)(b). Unlike property of the estate under the Bankruptcy Code where an interest of the debtor in property becomes property of the estate notwithstanding any provision in an agreement, such as the Articles of Organization, that restricts or conditions transfer of such interest by the debtor, *see* U.S.C. § 541(c)(1),

Section 43(5) of the Hong Kong Bankruptcy Ordinance provides in pertinent part the following:

> For the purposes of any provision in this Ordinance, property comprised in a bankrupt's estate is so comprised subject to the rights of any person other than the bankrupt (whether as a secured creditor of the bankrupt or otherwise) in relation thereto . . .

Although the Hong Kong Bankruptcy Ordinance defines the bankrupts' estate for purposes of the Turnover Motion, resolution of the parties' disputes hinge on interpretation of provisions of Chapter 15. Section 1521 of the Bankruptcy Code pertains to relief available upon recognition of a foreign proceeding, whether main or nonmain, "*where necessary to effectuate the purpose of this chapter* and to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1521(a)(emphasis supplied). It further provides: "[a]t the request of the foreign representative," the Bankruptcy Court may, grant any appropriate relief, including - - "entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court . . . ." 11 U.S.C. § 1521(a)(5). Additionally, section 1521(b) authorizes the court to "entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative . . . provided that the *interests of creditors in the United States are sufficiently protected*." 11 U.S.C. § 1521(b) (emphasis supplied). Finally, section 1522(a) provides, in pertinent part, the following:

> (a) The court may grant relief under section 1519 or 1521, or may modify or terminate relief under subsection (c), *only if the interests of the creditors and*

42

*other interested entities, including the debtor, are sufficiently protected. . .*

(c) The court may, at the request of the foreign representative or an entity affected by relief granted under section 1519 or 1521, or at its own motion, modify or terminate such relief.

11 U.S.C. § 1522(a) (emphasis supplied).

The provisions of Chapter 15 make clear that the Court is to be guided in its decision making by the purpose of Chapter 15, which are set forth in section 1501(a)(1)-(5), which include "protection and maximization of the value of the debtor's assets."   11 U.S.C. § 1501(a)(4). Moreover, section 1508 of the Bankruptcy Code directs the Court, "[i]n interpreting this chapter, . . . [to] . . . consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508."  According to the court in In re Tri-Cont'l Exch. Ltd., 349 B.R. 627 (Bankr. S.D. Cal. 2006),  a crucial goal is "uniformity of interpretation." Id. at 633 (citing § 1508).   The court observed that  "Congress also focused the attention of United States courts to various international sources when construing chapter 15, which sources Congress described as "persuasive." Id. (citing *House* Rep. No. 109–31 at 109–10).  In particular, according to the court in Tri-Cont'l Exch., "[o]ne of the sources that a United States court is obliged to treat as persuasive is the Guide to Enactment of the UNCITRAL Model Law Insolvency that was promulgated in connection with the approval of the Model Law.  *Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency*, U.N. Gen. Ass., UNCITRAL 30th Sess., U.N. Doc. A/CN.9/442 (1997) ("*Guide*")." Id.

43

In implementing the purposes of Chapter 15 and applying the principles set forth

in sections 1521 and 1522, this Court, in fashioning relief, as noted above, must consider

how  best "to protect the assets of the debtor or the interests of creditors" and the "other

interested entities, including the debtor." According to the California bankruptcy court in

Cont'l Exch., "[s]tandards that inform the analysis of § 1522 protective measures in

connection with discretionary relief emphasize the need to tailor relief and conditions so

as to balance the relief granted to the foreign representative and the interests of those

affected by such relief, without unduly favoring *one group of creditors* over another." Id. at

37 (citing *Guide* at ¶¶ 161–63) (emphasis supplied). [14] The court in In re Atlas Shipping A/S,

---

[14] The California bankruptcy court observed that section 1522 was based on
article 22 of the Model Law and that bankruptcy courts are given "'broad latitude to
mold relief to meet specific circumstances." Id. at 637 (citing  H.R.Rep. No. 109–31, at
116, U.S.Code Cong. & Admin.News 2005, pp. 88, 178).  In a footnote, the court
explained that the broad latitude standard under section 1522  allows the bankruptcy
court "to mold relief to meet specific circumstances, including appropriate responses if
it is shown that the foreign proceeding is seriously and unjustifiably injuring United
States creditors." Id. at 637 n. 13.  The court also cited the *Guide* which provides:

> 161. The idea underlying article 22 is that there should be a balance
> between relief that may be granted to the foreign representative and the
> interests of the persons that may be affected by such relief. This balance is
> essential to achieve the objectives of cross-border insolvency legislation.

> 162. The reference to the interests of creditors, the debtor and other
> interested parties in article 22, paragraph 1, provides useful elements to
> guide the court in exercising its powers under article 19 or 21. In order to
> allow the court to tailor the relief better, the court is clearly authorized to
> subject the relief to conditions (paragraph 2) and to modify or terminate
> the relief granted (paragraph 3). An additional feature of paragraph 3 is
> that it expressly gives standing to the parties who may be affected by the
> consequences of articles 19 and 21 to petition the court to modify and
> terminate those consequences. Apart from that, article 22 is intended to

404 B.R. 726 (Bankr. S.D.N.Y. 2009), outlined three basic principles governing sufficient

protection.  It stated:

> One court has described "sufficient protection" as embodying three basic
> principles: "the just treatment of all holders of claims against the bankruptcy
> estate, the protection of U.S. claimants against prejudice and inconvenience
> in the processing of claims in the [foreign] proceeding, and the distribution
> of proceeds of the [foreign] estate substantially in accordance with the order
> prescribed by U.S. law." In re Artimm, 335 B.R. at 160 (analyzing under §
> 304(c) of the old Code, but noting that the analysis would be "essentially the
> same" under § 1521(b)).

Atlas Shipping, 404 B.R. at 740.

B. Issues

The dispute between the Foreign Representatives, on the one hand, and the Foreign

Debtors and the US Companies, on the other hand, involves the narrow issue of whether

the relief requested by the Foreign Representatives in their Turnover Motion, full

entrustment of the Foreign Debtors' equity interests for purposes of "administration and

---

operate in the context of the procedural system of the enacting State.

163. In many cases the affected creditors will be "local" creditors.
Nevertheless, in enacting article 22, it is not advisable to attempt to limit it
to local creditors. Any express reference to local creditors in paragraph 1
would require a definition of those creditors. An attempt to draft such a
definition (and to establish criteria according to which a particular
category of creditors might receive special treatment) would not only
show the difficulty of crafting such a definition but would also reveal that
*there is no justification for discriminating creditors on the basis of criteria such as*
*place of business or nationality.*

Guide, ¶¶ 161–63 (emphasis supplied).

In re Tri_Cont'l Exchange Ltd., 349 B.R. at 637 n. 14.

realization" and distribution, involves more than merely "stepping into the shoes" of the Foreign Debtors.  In other words, will the allowance of the Turnover Motion precipitate "transfers" triggering defaults under the loan documents and provisions governing the rights of first refusal in the Articles of Organization and Operating Agreements?  The relief requested also involves the broader issue of whether the Foreign Representatives' Turnover Motion should be granted to permit them to take financial control of the Foreign Debtors' equity interests with a view toward holding and selling those interests if the real estate market improves with the concomitant availability of equity in the portfolios.

    C. Burdens of Proof

    The parties did not submit, and the Court was unable to find, decisions specifically addressing the burdens of proof with respect to turnover motions in the context of Chapter 15 cases.  As the movants, the Court concludes that Foreign Representatives have the initial burden of establishing that they are entitled to relief under 11 U.S.C. §§ 1521(a)(5), 1521(b), and 1522(a) and should be entrusted with the administration and realization, of the Foreign Debtors' equity interests in the US Companies and the distribution of equity interests which comprise part of the Foreign Debtors' assets in the United States. The Court further concludes that the Foreign Representatives have the initial burden of demonstrating that the interests of the Foreign Debtors and the US Companies are sufficiently protected, but that the ultimate burden of establishing the absence of sufficient protection rests on the objecting parties.  The Court's conclusion is consistent with the burden of proof imposed with respect to turnover motions filed pursuant to 11 U.S.C. § 542. Although section 542

46

is inapplicable to Chapter 15 cases, *see* 11 U.S.C. § 103(a), the burden of proof applicable to

that section of the Bankruptcy Code is warranted here as it is both consistent with the

parties' Stipulation Regarding Verified Petition, quoted above, and equitable under the

circumstances where the US Companies have neither alleged nor established that they are

creditors of the Foreign Debtors.

In <u>In re Meyers</u>, 616 F.3d 626 (7th Cir. 2010),  the United States Court of Appeals for

the Seventh Circuit stated:

> Under the defunct Bankruptcy Act, we laid out the burdens of persuasion in
> turnover actions as follows. The trustee must bring the action to claim
> property for the bankruptcy estate, and she bears the burden of establishing
> a prima facie case for turnover. <u>Gorenz v. Ill. Dep't of Agric.</u>, 653 F.2d 1179,
> 1184 (7th Cir. 1981) (citing <u>Maggio v. Zeitz</u>, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed.
> 476 (1948)). Once a prima facie case is established, the debtor must provide
> a reason for going forward with the case, but the ultimate burden of
> persuasion remains with the trustee at all times. <u>Id.</u> *See* <u>In re U.S.A.</u>
> <u>Diversified Products, Inc.</u>, 196 B.R. 801, 805 (N.D. Ind. 1996) (applying this
> approach under the Code); <u>In re Schneider</u>, 417 B.R. 907, 919 (Bankr. N.D. Ill.
> 2009) (same). We take this opportunity to place our imprimatur on this
> approach under the Bankruptcy Code. Asking the trustee to engage in
> extensive investigations and complicated calculations before filing a turnover
> order will necessarily result in increased costs to the bankruptcy estate, *see*
> 11 U.S.C. § 507(a)(1)(C) — costs that we do not believe are necessary unless
> and until the debtor provides a reason to go forward. At the same time, our
> approach gives every debtor the opportunity to challenge the trustee's
> proposed assessment of the estate's interest. The weaker the trustee's case,
> the easier it will be for the debtor to upset it.
>
> There is some dispute whether the trustee must establish the estate's right to
> the property by a preponderance of the evidence or by the more demanding
> standard of clear and convincing evidence. *Compare* <u>In re Quality Health</u>
> <u>Care</u>, 215 B.R. 543, 549 (Bankr. N.D. Ind. 1997) (adopting the
> preponderance-of-evidence standard based on <u>Grogan v. Garner</u>, 498 U.S.
> 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), which applied that standard
> to dischargeability exceptions) *with* <u>Evans v. Robbins</u>, 897 F.2d 966, 968 (8th

Cir. 1990) (applying the clear-and-convincing-evidence standard). *See also* Oriel v. Russell, 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419 (1929) (applying the clear-and-convincing standard to a turnover action almost half a century prior to the adoption of the Bankruptcy Code). Although we think that the default preponderance standard that the Supreme Court applied to dischargeability in Grogan is probably the appropriate one also for turnover actions, because we would come to the same conclusion in this case under either evidentiary standard, we need not resolve that issue today.

In re Myers, 616 F.3d at 629-30.   *See* In re Int'l Banking Corp. B.S.C., 439 B.R. 614, 626 (Bankr. S.D.N.Y. 2010) (court recognized that "turnover, like the other remedies provided in § 1521, is discretionary"); In re Bear Stearns High–Grade Structured Credit Strategies Master Fund, Ltd., 389 B.R. 325, 333 (S.D.N.Y.2008) (In contrast to recognition, which turns on "strict application of objective criteria," post-recognition relief is "largely discretionary. . . ."). *See also* Braunstein v. McCabe, 571 F.3d 108 (1st Cir. 2009)(noting that turnover is historically equitable in nature).

Applying the standard enunciated by the Seventh Circuit in Meyers, the Court concludes that the Foreign Representatives satisfied their burden of proof by a preponderance of the evidence for multiple reasons, including 1) the purposes of Chapter 15 set forth in 11 U.S.C. § 1501 and the provisions of the Hong Kong Bankruptcy Ordinance, which are similar to, and not inconsistent with, the provisions of the Bankruptcy Code, *see* Atlas Shipping, 404 B.R. at 740; 2) the testimony of Mr. Lees in which he enunciated reasonable goals and conditions for realizing the value of the Foreign Debtors' equity interests; 3) the Stipulation Regarding Verified Petitions Seeking Entry of Order Recognizing Foreign Main Proceedings in which the parties agreed that "United

States law will govern any action taken by the Foreign Representatives against the US Companies, including . . . any attempt by them to liquidate or otherwise realize upon the foreign Debtors' interest(s) in the US Companies, or any challenge to the operation or management of the US Companies;" 4) the fiduciary duties imposed upon shareholders of closely held corporations and members of limited liability companies; and 5) the status of the US Companies, which have never identified themselves as creditors of the Foreign Debtors.  Because the Foreign Representatives satisfied their burden of proof with respect to the allowance of the Turnover Motion, the US Companies and the Foreign Debtors, to defeat allowance of the Turnover Motion, must establish lack of sufficient protection.  In short, the Court finds for the reasons set forth in more detail below, that the Hong Kong Bankruptcy Ordinance provides for the just treatment of holders of claims against the Foreign Debtors' bankruptcy estate and for distributions of proceeds substantially in accordance with the Bankruptcy Code and that any U.S. claimants will not be prejudiced or inconvenienced because the Chapter 15 proceedings shall remain open.  *See* Atlas Shipping, 404 B.R. at 740.  In this regard, the Court further rules that the Foreign Debtors and the US Companies, while raising valid concerns with respect to defaults under the loan documents and transfer restrictions in the Articles of Organization and Operating Agreements, failed to establish that their interests would not be sufficiently protected if the Turnover Motion is granted.

D. Provisions of Chapter 15 and the Hong Kong Bankruptcy Ordinance

The  Court  has  highlighted  the  provisions  of  section  1501,  which  should  be

interpreted "to promote an application . . . consistent with the application of similar

statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. The Hong Kong Bankruptcy

Ordinance and the Bankruptcy Code both set forth duties of trustees and debtors, establish

priority for distributions to classes of creditors, and provide for the recovery of preferential

and fraudulent transfers. Section 60 of the Hong Kong Bankruptcy Ordinance sets forth

the powers of the Foreign Representatives, as trustees. It provides:

> Subject to the provisions of this Ordinance and to any order of the court, the
> trustee . . . may do all or any of the following things - -
>
> (aa) *take into his custody or under his control all the property to which the bankrupt
> is or appears to be entitled*;
>
> (a) *sell all or any part of the property of the bankrupt* . . . by public auction or
> private contract, with power to transfer the whole thereof to any person or
> company, or to sell the same in parcels, . . .
>
> (d) exercise any powers the capacity to exercise which is vested in the trustee
> under this Ordinance [sic] and execute any powers of attorney, deeds and
> other instruments for the purpose of carrying into effect the provisions of this
> Ordinance;
>
> (e) subject to section 61, do all such other things as may be necessary for
> administering the estate and distributing its assets.

(emphasis supplied). Moreover, pursuant to Section 62 of the Bankruptcy Ordinance, the

Foreign Representatives, "with the permission of the creditors' committee, may appoint the

bankrupt himself to superintend the management of the property of the bankrupt or of any

part thereof. . . and in any other respect to aid in administering the property, in such

manner and on such terms as the trustee may direct." That provision may, if utilized by

the Foreign Representatives, minimize costs to the estate and avoid potential issues with

50

respect to the provisions in the loan documents requiring Raymond Lee's ongoing management of ODE and EWE. Coincident to the duties of the Foreign Representatives, the Foreign Debtors pursuant to Section 26(3) of the Bankruptcy Ordinance are required to "aid *to the utmost of . . .[their] . . . power* in the realization of . . . property and the distribution of the proceeds among . . . creditors." (emphasis supplied). That provision resonates with 11 U.S.C. § 521(a)(3), which requires debtors to cooperate with the trustee "as necessary to enable the trustee to perform the trustee's duties under this title." In addition, the Bankruptcy Ordinance, in sections 37 and 38, like the Bankruptcy Code, contains provisions prioritizing payment of classes of claims.

E. <u>The Testimony of the Foreign Representative</u>

Based upon those provisions of the Bankruptcy Ordinance, the Court finds credible the testimony of Mr. Lees that he is motivated by his duty to exercise control over the Foreign Debtors' equity interests, a duty which is similar to the duties of a trustee under the provisions of the Bankruptcy Code set forth in 11 U.S.C. §§ 521 and 704. Mr. Lees testified that the Foreign Representatives are experienced insolvency professionals who would engage the appropriate agents to facilitate entrustment of the Foreign Debtors' equity interests. In addition, Mr. Lees indicated that he did not intend to precipitously liquidate the Foreign Debtors' equity interests, and he repeatedly stated that he was bound by the transfer restrictions in the Articles of Organization and Operating Agreements.

In summary, Hong Kong law is consistent with United States law and the Foreign Representatives' rights will be no greater than the rights that the Foreign Debtors could

51

have exercised. Mr. Lees testified that, if entrusted with the Foreign Debtors' equity interests, the Foreign Representatives will abide by the transfer restrictions in the operative articles and agreements, thereby ensuring that the rights of the US Companies and their equity owners will be protected. Aware of the loan modification affecting the property owned by Oasis Ten Milk Street LLC which will expire in November of 2012 and the maturation of Eastern Bank loan affecting the properties in the EWE portfolio, the Foreign Representatives are entitled to "seats at the table." Their duties to the Hong Kong creditors, which are analogous to the duties of a Chapter 7 trustee, compel the Foreign Representatives to be more than passive recipients of distributions from US Companies, a scheme altered by the Stipulation Resolving Stipend Motion and Partially Resolving Turnover Motion, and after-the-fact information about loan modifications or other workouts.

F. The Stipulation Regarding Verified Petitions and Fiduciary Duties

The parties stipulated to the applicability of the laws of the United States to their disputes. Accordingly, the interests of the US Companies are sufficiently protected because any attempt by the Foreign Representative "to liquidate or otherwise realize upon the Foreign Debtors' interest(s) in the US Companies, or any challenge, to the operation or management of the US Companies" will be governed by United States law. Indeed, in their Turnover Motion, the Foreign Representatives reference 11 U.S.C. § 363.

ODE, EWE and ODE, Asia, LLC are Massachusetts corporations and a Massachusetts limited liability company, respectively. With respect to closely held

52

corporations,[15] such as ODE and EWE, stockholders owe one another fiduciary duties.

> Because of the fundamental resemblance of the close corporation to the partnership, the trust and confidence which are essential to this scale and manner of enterprise, and the inherent danger to minority interests in the close corporation, *we hold that stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another. In our previous decisions, we have defined the standard of duty owed by partners to one another as the 'utmost good faith and loyalty.'* Cardullo v. Landau, 329 Mass. 5, 8, 105 N.E.2d 843 (1952); DeCotis v. D'Antona, 350 Mass. 165, 168, 214 N.E.2d 21 (1966). Stockholders in close corporations must discharge their management and stockholder responsibilities in conformity with this strict good faith standard. They may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation.

Donahue v. Rodd Electrotype Co. of N.E., 367 Mass. 578, 592-93 (1975) (footnote omitted, emphasis supplied). *See also* W. Chesterton Co., Inc. v. Chesterton, 128 F.3d 1, 5-6 (1st Cir. 1997); In re Access Cardiosystems, Inc., 404 B.R. 593, 677 (Bankr. D. Mass. 2009). Similarly, members of limited liability companies cannot act with impunity toward fellow members. *See* One to One Interactive, LLC v. Landrith, 76 Mass. App. Ct. 142, *review denied,* 456 Mass. 1105 (2010). *See generally* J. William Callison and Maureen A. Sullivan, *Limited Liability Companies: A State-by-State Guide to Law and Practice,* § 8.7 (2011). Because the Foreign Representatives are "stepping into the shoes" of the Foreign Debtors, whatever actions they take in the performance of their duties must comport with the fiduciary duties imposed by Massachusetts law. Thus, in the event that the Foreign Representatives in any way ignore

---

[15] The US Companies referred to the corporations as being closely held. Closely held corporations are characterized by a small number of stockholders, no ready market for corporate stock, and substantial majority stockholder participation in the management, direction and operations of the corporation. *See* Pointer v. Castellani, 455 Mass. 537, 549 (2009) (citing, *inter alia,* Brodie v. Jordon, 447 Mass. 866, 868-69 (2006)).

the rights of first refusal or other duties owed to the Foreign Debtors or the US Companies, this Court, as the repository of "United States laws," is available to address any disputes that may arise among the parties.

G. Alleged Absence of Sufficient Protection

In response to the Turnover Motion, the Foreign Debtors and the US Companies emphasize the default provisions in the loan documents, highlighting Raymond Lee's exposure as a "carve-out" guarantor (meaning that upon the occurrence of certain conditions specified in the loan documents he will become personally liable for the outstanding loan amounts) for approximately $217 million in loans, and the transfer restrictions in the Articles of Organization and Operating Agreements. The Court recognizes that the lenders could have issued notices of default in response to the Hong Kong proceedings; they did not do so. In addition, they have not sought to enforce any guaranties executed by Raymond Lee either with respect to the 50 Dunham Road, Beverly, Massachusetts property or the Ten Milk Street, Boston, Massachusetts property.

The Foreign Debtors and the US Companies failed to introduce any evidence that the lenders have taken any actions, or are likely to take any actions, in the Chapter 15 cases to enforce the default provisions or the guaranties executed by Raymond Lee. Indeed, none of the lenders, including Wells Fargo, Merrill Lynch, Column Financial, Eastern Bank, or CMBS trust, the assignee of Wells Fargo and Merrill Lynch, have filed notices of appearance in the case. In view of the existing defaults arising from the commencement of the Hong Kong proceedings and the existing default resulting from the nonpayment of

54

the Eastern Bank loan at maturity, and arguably the modification of the Oasis Ten Milk Street loan, the Court is not persuaded that the potential for default declarations is sufficient to establish the absence of sufficient protection for the interests of the Foreign Debtors and the US Companies, particularly where under both the Hong Kong Bankruptcy Ordinance and the Bankruptcy Code the interests of the US Companies, as non-creditors, must be subordinated to the interests of the Hong Kong creditors.

With respect to the transfer restrictions, the Foreign Representatives have indicated through Mr. Lees's testimony that they are bound by those restrictions as a result of Section 43(5) of the Hong Kong Bankruptcy Ordinance, although they maintain that vesting alone is insufficient to trigger the rights of first purchase, a contention vigorously challenged by the Foreign Debtors and the US Companies and the salient issue in the case. Among the transfer restrictions, none is more problematic than that in the Articles of Organization for ODE. Article V, Paragraph 4.(a)(iv), which is not a model of clarity, provides that a transfer event, triggering a first right of purchase includes a circumstance where the stockholder "is subject to a judgment, court order or decree or by operation of law is otherwise required to transfer Stock to other than an Authorized Transferee." Because the Articles of Organization for EWE lack language similar to that set forth in Article V, Paragraph 4.(a)(iv), the Court concludes that the vesting of the shares or membership interests in the Foreign Representatives is not a transfer that would trigger the rights of first purchase set forth in those documents, although, the Court notes that the Operating Agreement for ODE Asia, LLC may limit the Foreign Representatives' to receipt of "allocations and

distributions."

Pursuant to Article V, Paragraph 4.(b) of ODE's Articles of Organization,

*. . . A stockholder shall, within 10 days of the occurrence of a Transfer Event* specified in clauses (ii) through (iv) of subparagraph (a) *give written notice thereof to the corporation*. If the corporation declines or fails to exercise timely its first right of purchase as provided in paragraph 5, then the legal representative, beneficiary, trustee, assignee, receiver or other transferee who obtained the Stock by reason of the Transfer Event may retain the Stock, subject to the provisions of this Article V.

(emphasis supplied). Pursuant to Article V, Paragraph 5,

Upon receipt of written notice of intent to make a voluntary transfer under paragraph 3 or upon the occurrence of a Transfer Event specified in paragraph 4, the corporation shall have a right to purchase any or all of the shares of Stock to which such notice or Transfer Event relates *at the price specified therein* before any other action is taken to sell, assign, transfer, pledge, or otherwise dispose of the Stock. Such right shall continue for a period of 90 days from . . . *the receipt of written notice of a Transfer Event*, and in any event shall continue for 15 days from the date of receipt by the corporation or [sic] an appraisal made pursuant to paragraph 7(a). If the corporation elects to exercise such first right of purchase, it shall so notify the holder of such shares of Stock, specifying the number of shares, manner of payment and time and place for tender of certificates representing such shares of Stock.

(emphasis supplied). The Court has no evidence that the Foreign Debtors, as stockholders

of ODE, complied with Paragraph 4.(b) by sending written notice to ODE that they were

adjudged bankrupts under the Hong Kong Bankruptcy Ordinance, although the Court

takes judicial notice of a certificate of service filed by the Foreign Representatives pursuant

to which ODE was served on December 9, 2009 with notice of the Chapter 15 petitions and

other documents. Because Raymond Lee was and is both President and Chief Executive

Officer of ODE, written notice that the Foreign Representatives acceded to the equity

interests of the Foreign Debtors pursuant to Section 58(3) of the Hong Kong Bankruptcy

Ordinance by the Foreign Debtors to ODE would elevate form over substance and serve

no practical purpose.  Moreover, the absence of a "price specified therein," with respect to

a purported transfer event "by operation of law," resulting from the vesting of the Foreign

Debtors' equity interests in the Foreign Representatives, makes application of the first right

of purchase specified in Paragraph 5 difficult at best and meaningless at worst.

In summary, with respect to a transfer event specified in Article V, Paragraph

4.(a)(iv), two circumstances are immediately obvious from that provision:  1) the US

Companies, and ODE in particular, have been aware of the appointment of Mr. Lees and

Mat Ng as provisional trustees since August of 2009 when the Foreign Debtors were

adjudged bankrupts by the Hong Kong court (or at the latest in December of 2009 when

the US Companies were served with notices of the Chapter 15 cases) and that pursuant to

Section 58(3) of the Hong Kong Bankruptcy Ordinance, the Foreign Representatives were

vested with ownership of the equity interests on their appointment; and 2) ODE did not

exercise any rights to purchase arising from that event pursuant to Article V, Paragraph 5.


Even if the Court were to assume that ODE and the US Companies were unaware

of that provision of the Hong Kong Ordinance in August of 2009, pursuant to Paragraph

4.(b), 90-days have passed since the Foreign Representatives filed the Turnover Motion.

Accordingly, the Court finds that, at least with respect to ODE, the US Companies, waived

reliance upon a written notice of a transfer event from the Foreign Debtors to ODE and,

more importantly, "vesting" as a Transfer Event.  Accordingly,  ODE, despite its present

opposition, waived the right of first purchase arising from the Foreign Representatives

"stepping into the shoes" of the Foreign Debtors with respect to their equity interests

pursuant to Article V, Paragraph 5.

Alternatively, the Court concludes that Paragraph 6 of Article V of ODE's Articles

of Organization, pertaining to "Transfers in Violation of Article," which was not referenced

by any of the parties, provides additional protection to the US Companies.  It provides in

relevant part the following:

> If any transfer of shares of Stock is made or attempted contrary to the
> provisions of this Article V, or if shares of Stock are not offered to the
> corporation as required herein, the corporation shall have the right to
> purchase said shares from the owner thereof or his transferee at any time
> before or after the transfer, as herein provided.  In the event that the
> corporation elects to exercise its first right of purchase, it may do so by
> canceling the certificate(s) representing the Stock and depositing the
> purchase price, as determined pursuant to paragraph 7 hereof, in a bank
> account for the benefit of a stockholder.  In addition to any other legal or
> equitable remedies which it may have, the corporation may enforce its rights
> by actions for specific performance (to the extent permitted by law) and may
> refuse to recognize any transferee as one of its stockholders for any purpose,
> including without limitation dividend and voting rights, until there has been
> compliance with all applicable provisions of this Article V.

Thus, Paragraph 6 provides further protection to the US Companies, which, in any event,

failed to introduce any evidence that they have either the willingness or ability to tender

the purchase price for the Foreign Debtors' shares of ODE which, pursuant to Article V,

Paragraph 7.(a) is stated to be "the book value per share" as determined by an independent

accountant then representing the corporation or a certified public accountant appointed by

the board of directors.

Similarly, the Amended and Restated Operating Agreement for ODE, Asia, LLC, which the parties agreed is typical of all the limited liability companies, provides at paragraph 6(c) that no member "may sell . . . or otherwise transfer, including without limitation, any assignment or transfer by operation of law or by order of court . . . , such Member's interest in the LLC or any part thereof, or in all or any part of the assets of the LLC, without the written consent of the Manager, and any purported transfer without such consent (a "Prohibited Transfer") shall be null and void and to no effect whatsoever." The Operating Agreement further provides that if the LLC is required to recognize a Prohibited Transfer, "the interest so transferred shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the transferred interest (and the transferee shall not thereby become a Member of the LLC) . . . ." Although the Court does not consider vesting under Section 58(3) of the Hong Kong Bankruptcy Ordinance to be a transfer, even if the Court were to conclude otherwise, the Foreign Representatives are entitled to allocations and distributions as provided in the agreements.

In view of the provisions discussed above, the Court finds that the Foreign Debtors and the US Companies, while making cogent and sincere arguments, ultimately failed in their burden of proof. The Court concludes that neither the default provisions in the loan documents nor the transfer restrictions in the Articles of Organization or Operating Agreements are impediments to the allowance of the Turnover Motion. Not only do the Articles of Organization of ODE and EWE provide sufficient protection to ODE, the

59

provisions of the Bankruptcy Ordinance also provide sufficient protection - -indeed more protection than what would be available under the Bankruptcy Code.

## V. CONCLUSION

The valuations of the properties in the Oasis Group portfolio and the EWE portfolio in relation to the mortgage debt present novel practical and legal problems for the Foreign Representatives, the US Companies, and the Foreign Debtors.  The properties in the portfolios have the potential to continue generating distributions while increasing in value, such that the Foreign Representatives may wish to solicit offers for the Foreign Debtors' equity interests, at which time they will be bound by the transfer restrictions in the Articles of Organization or Operating Agreements and all parties will be bound by the fiduciary duties imposed by Massachusetts law.  The Court concludes that the Foreign Representatives are duty-bound to maximize the value of the equity interests of the Foreign Debtors and that their interests are neither inconsistent with the Bankruptcy Code nor the interests of the US Companies.  Similarly, the Court does not view the position of the Foreign Representatives as adverse to the lenders whose views have not been articulated in this contested matter.  In view of the Stipulations of the parties, and the evidence presented, the Court shall enter an order granting the Turnover Motion.

By the Court,

Joan N. Feeney

United States Bankruptcy Judge

Dated:  June 4,  2012